# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPHY ALBERTO VENTURA, | : | |
| | : | |
| Petitioner | : | CIVIL ACTION NO. 3:13-CV-01936 |
| | : | |
| vs. | : | (Petition Filed 07/16/2013) |
| | : | |
| JON D. FISHER, ET AL., | : | (Judge Caputo) |
| | : | |
| Respondents | : | |

## MEMORANDUM

Petitioner, Josephy Alberto Ventura, on July 16, 2013, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Ventura attacks the judgment of conviction and sentence imposed by the Court of Common Pleas of Centre County, Pennsylvania, after a jury returned a guilty verdict. Ventura was charged with first and third degree murder.[1] The

---

[1] In Pennsylvania first degree murder, 18 Pa.C.S.A. § 2502(a) is committed by an intentional killing. The words "intentional killing" are statutorily defined as a willful, deliberate, and premeditated killing. 18 Pa.C.S.A. § 2502(d). The legal malice essential for a conviction of first degree murder is a specific intent to kill. Commonwealth v. Cruz, 919 A.2d 279 (Pa. Super. 2007), appeal denied, 928 A.2d 1289 (Pa. 2007). In other words, the Commonwealth must prove beyond a reasonable doubt that the killing was willful, deliberate, and premeditated in order to obtain a conviction. Commonwealth v. Garcia, 479 A.2d (Pa. 1984). The specific intent to kill, i.e., the legal malice, for first degree murder may be established by circumstantial evidence consisting of evidence that a deadly weapon was used on a vital part of the victim's body. Commonwealth v. Cruz, supra. In order to convict an individual of third degree murder, the Commonwealth is not required to prove specific intent. Instead, the legal malice which the Commonwealth must prove beyond a reasonable doubt is that the individual consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury. Commonwealth v. Devine, 26 A.3d 1139 (Pa. Super. 2011). As in the case of first degree murder, the legal malice for third degree murder may be inferred from the use of deadly weapon on a vital part of the victim's body. Commonwealth v. Truong, 36 A.3d 592 (2012).

jury found Ventura guilty of third degree murder and he received a sentence of 20 to 40 years of imprisonment.  The victim was Michael Donahue.  Ventura argues that the trial court improperly excluded expert testimony relating to the manner of death and his state of mind at the time of killing and failed to suppress statements which he made to law enforcement personnel, and that his trial counsel was ineffective for failing to object to certain jury instructions.  In accordance with United States v. Miller, 197 F.3d 644 (3d Cir. 1999) and Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), the Court issued formal notice to Ventura that he could either have the petition ruled on as filed, that is, as a § 2254 petition for writ of habeas corpus and heard as such, but lose his ability to file a second or successive petition, absent certification by the court of appeals, or  withdraw his petition and file one all-inclusive § 2254 petition within the one-year statutory period prescribed by the Antiterrorism Effective Death Penalty Act. Doc. 2.  On July 30, 2013, in response to the Notice, Ventura elected to have the court rule on his petition as filed. Doc. 3.  By Order dated August 8, 2013, the Court directed respondents to file an answer to Ventura's petition and a brief in support of their answer.  Doc. 4.  An answer and appendices were filed by the Centre County District Attorney on February 18, 2014, and a brief on February 20, 2014.  Docs. 18 and 19.  The matter became ripe for disposition on March 10, 2014,  when Ventura elected not to file a reply brief.

For the reasons that follow, the Court will deny Ventura's petition.

**Background**

On February 16, 2006, during the evening hours Donahue and a group of friends visited Club Love, a bar located at 129 ½ South Pugh Street, State College, Pennsylvania. Doc. 11, Petitioner's Memorandum, p. 5; Doc. 18-1, Respondents'

Appendices, Appendix C at 28-45 & 55-59, Appendix G at 118, & Appendix F at 105. Ventura, his girlfriend Kristen Fisher and a friend Robert Walsh also visited Club Love on February 16th. Id.

Prior to arriving at Club Love, Ventura and Fisher went "to Mad-Mex to eat wings" and while there they consumed several margaritas. Id.  Ventura and Fisher left Mad-Mex "around 7:00, 7:30" p.m. and picked Walsh up at work, the Pita Pit, a fast food, deli-type restaurant. Id.  They also picked up a 24-case of beer and then went to Walsh's apartment. Id.  While at Walsh's apartment Ventura consumed four to six beers and Walsh suggested that they go to Club Love later that evening. Id.   Ventura and Fisher then went to their apartment to change and while there they apparently had an argument. Id.  Ventura as a result of the argument left the apartment, picked up Walsh and went to Club Love.  Id.

There was a line of patrons attempting to enter Club Love and while Ventura and Walsh were waiting in that line, Fisher showed up in a taxi cab and she had in her possession a kitchen paring knife. Id.  Ventura claims that he walked over to the taxi cab, an argument ensued and Fisher threatened him with the knife but he did not take the knife away from her at that time. Id.  The argument apparently abated and the three of them stood in line until they entered Club Love sometime between 9:30 and 10:00 p.m.  Id.

At some point after entering Club Love, Ventura testified that he was socializing and dancing with female friends from the Pita Pit and remembered that Fisher had the knife and was concerned that she might get jealous. Id. Ventura at that point claims he took the knife away from Fisher and placed it in his pocket. Id.  Subsequently, Walsh struck up a conversation with a female patron who apparently took offense and walked away from him. Id.   Donahue observed this conversation, approached Walsh and an argument

developed between Donahue and Walsh. Id.   Giovanni Ortiz, a friend of Donahue,  was standing next to Donahue at the time and another individual Joseph Checchi was immediately behind Ortiz. Id.   Ventura testified that he observed this encounter and approached in attempt to calm this situation. Id.   He further testified that the argument dissipated and that "everything was okay" and everyone was "chillin." Id.   However, at or about 1:30 a.m. on February 17th another argument erupted between Ventura and Ortiz. Id. Ventura testified that Ortiz "push[ed] [Fisher's] face" and that Ventura "kind of like lost it a little bit[.]" Id.  Donahue at that point intervened, Ventura pulled the knife from his pocket and stabbed Donahue once in the chest resulting in a wound to the heart. Id.  Donahue died two days latter at the hospital. Id.

After the incident, bar security intervened and Ventura was detained pending the arrival of members of the State College Police Department. Id., Appendix K at 167-168. While waiting for the arrival of the police, in response to a statement "You fucking stabbed him" from a Club Love security officer, Ventura made the following statement: "You know how it is. He hit my girl." Id.   After the State College police arrived and while Ventura was being detained, Ventura blurted out that Donahue struck his pregnant girlfriend. Id.  Fisher, however, was not pregnant at the time. Id., Appendix C at 45.  While being transported to the State College police station and while in the elevator at the police station Ventura continued to blurt out unsolicited statements. Id., Appendix K at 168.  One of the statements blurted out by Ventura while being transported to the police station was that he did not intend to kill Donahue. Id., Appendix C at 40.

The record further reveals that at the police station the "police briefly searched Ventura, but did not uncover anything" but "[l]ater while monitoring Ventura in his holding cell

via video surveillance, police witnessed him trying to put something in his jacket." Id., Appendix L at 181. A second search of Ventura revealed "a knife inside the lining of one of Ventura's jacket pockets." Id. After discovering the knife Ventura blurted out that the knife belonged to him and he used it recently to perform some work on the gas filter of his motor vehicle. Id., Appendix L at 189 & 191. Fisher testified that the knife - a paring knife - was taken from her apartment and that Ventura on February 16th had used it to attach a new license plate to his car. Id., Appendix C at 24. After the police discovered the knife and Ventura made the unsolicited statement, Ventura was advised of his Miranda rights and signed a form waiving them.[2] Id., Appendix L at 191-194. There were at least three police officers who had contact with Ventura prior to Ventura being advised of his Miranda rights. Id. at 190. All three testified that Ventura volunteered the above-referenced statements without any prompting. Id. at 190-191.

After being advised of his Miranda rights, Ventura continued to make statements to the police. Id., Appendix K at 169. At a pretrial suppression hearing, several officers testified that Ventura did not appear intoxicated and notably Ventura did not stagger or stumble while walking, and the officer who administered the Miranda warnings indicated Ventura did not slur his words and he was oriented to person, place and time. Id. & Appendix L at 193. Furthermore, Ventura was selective in the questions he answered. Id.

---

[2]In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court held that authorities must warn an accused who is subjected to custodial interrogation "not only that he has a right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him." Id. at 473. Under Miranda a person in custody must receive certain warnings before any official interrogation. Those warnings include that the individual has a "right to remain silent" and that "anything said can and will be used against the individual in court." Id. at 467-469.

Prior to trial defense counsel filed a motion for the appointment of the following three expert witnesses: (1) Dr. Richard Saferstein, a toxicologist; (2) Dr. Stanley E. Schneider, a psychologist; and (3) Dr. Jonathan L. Arden, a pathologist. Id., Appendix A at 2-4. Reports from these three experts were provided to the prosecutor and on July 24, 2007, the prosecutor filed a motion in limine in which he requested that the testimony of the experts be excluded from the upcoming trial. Id. The Court of Common Pleas granted the motion with respect to the testimony from Dr. Schneider and Dr. Arden. Id., Appendix B. Dr. Saferstein was permitted to testify at trial. Id. The Court of Common Pleas found that testimony from Dr. Saferstein regarding the effects of intoxication at various levels calculated for Ventura was relevant to a claim of diminished capacity negating specific intent which would reduce first degree murder to third degree murder.[3] Id. at 12.

Ventura argued that the testimony from Dr. Schneider was relevant to his claim of self-defense and related to a defense of diminished capacity due to mental disorders by negating the element of specific intent and whether or not he acted in the "heat of passion" to reduce the killing to voluntary manslaughter. Id. at 13-15. The Court of Common Pleas concluded that Dr. Schneider's report which presented Ventura's life history as a child, adolescent and early adult and then skipped forward to psychological issues during his incarceration after the incident was not relevant to establish Ventura's state of mind during the commission of the crime. Id. at 14-15. The Court of Common Pleas noted that Dr. Schneider's report indicated that Ventura suffered from personality disorders but that such disorders were not relevant to a claim of self-defense, diminished capacity or his cognitive

---

[3]Under Pennsylvania law, voluntary intoxication can reduce first degree murder to third degree murder but no lower.

ability to form specific intent under Pennsylvania law. Id.  The Court concluded that Dr.

Schneider's anticipated testimony did not relate to a claim that he acted under "heat of

passion" or in self-defense, and that it did not relate to a diminished capacity defense. Id.

As for Dr. Arden's anticipated testimony the Court concluded it was not relevant because Dr.

Arden did not challenge the cause of death but merely set forth a criticism of the techniques

employed by the pathologist who conducted the autopsy. Id. at 16. The Court concluded that

testimony from Dr. Arden would only confuse the jury and would not assist them in

understanding the evidence or determining a fact in issue. Id.

At trial Ventura testified that he did not intend to kill Donahue. Id., Appendix

C at 46.  The Court of Common Pleas when giving the closing charge to the jury not only

covered the elements of first and third degree murder but also went over the elements of

voluntary manslaughter[4] and involuntary manslaughter.[5]  Id. at 79-95.  The Court further

instructed several times on the issue of imperfect self-defense.[6] Id. at 93 and 95

**Standards of Review**

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper

---

[4]Under Pennsylvania law voluntary manslaughter, 18 Pa.C.S.A. § 2503, is where a person kills another individual without lawful justification under a sudden and intense passion resulting from serious provocation by the individual killed.  This type of homicide does not involve the legal malice required for murder but requires an intent to cause the injury.

[5]Under Pennsylvania law involuntary manslaughter, 18 Pa.C.S.A. § 2504, is where a person kills another individual as a direct result of doing an unlawful act in a reckless or grossly negligent manner, or doing a lawful act in a reckless or grossly negligent manner.

[6]"Imperfect self-defense" or "unreasonable belief killing" reduces murder to voluntary manslaughter.  This defense requires a knowing or intentional killing under a mistaken  or unreasonable belief that the killing is justified. 18 Pa.C.S.A. § 2503(b); Commonwealth v. Mouzon, 53 A.2d 738 (Pa. Super. 2012).

mechanism for a prisoner to challenge the "fact or duration" of his confinement.  Preiser v. Rodriguez, 411 U.S. 475, 498-499 (1973).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  Estelle v. McGuire, 502 U.S. 62, 67-8 (1991).  Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Estelle, 502 U.S. at 67-8 (1991); see also Pulley v. Harris, 465 U.S. 37, 41 (1984); Johnson vs. Rosemeyer, 117 F.3d 104 (3d Cir. 1997).

## A.  Exhaustion

Habeas corpus relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant.  See 28 U.S.C. § 2254(b)(1).  The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions.  See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

A state prisoner exhausts state remedies by giving the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999).  "All claims that a petitioner in state custody attempts to present to a federal court must have been presented to each level of the state courts."  Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000), cert. denied, 531 U.S. 1082 (2001).  Respect for the state court system requires that the petitioner demonstrate that the claims in question have been "fairly presented to the state courts."  Castille v. Peoples, 489 U.S. 346, 351 (1989).  Fair

presentation requires the petitioner to raise the claim in a procedural context in which the state courts can consider it on the merits.  Id.

The respondents concede that Ventura has exhausted his state court remedies.  The merits of the claims will therefore be addressed.

## B.  Merits

Section 2254(d) of Title 28 of the United States Code provides, in pertinent part, that an application for a writ of habeas corpus premised on a claim previously adjudicated on the merits in state court shall not be granted unless:

> (1) [the decision] was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) [the decision] was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  To establish that the decision was contrary to federal law "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome."  Matteo v. Superintendent, 171 F.3d 877, 888 (3d Cir. 1999).  Similarly, a federal court will only find a state court decision to be an unreasonable application of federal law if the decision, "evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent."  Id.

Further, under 28 U.S.C. § 2254(e)(1), a federal court is required to presume that a state court's findings of fact are correct.  A petitioner may only rebut this presumption

with clear and convincing evidence of the state court's error.  Miller-El v. Cockrell, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions) Matteo, 171 F.3d at 888; Thomas v. Varner, 428 F.3d 492, 497-98 (3d Cir. 2005).  This presumption of correctness applies to both explicit and implicit findings of fact. Campbell v. Vaughn, 209 F.3d 280, 286 (3d Cir. 2000).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

Like the "unreasonable application" prong of paragraph (1), a factual determination should be adjudged "unreasonable" under paragraph (2) only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record.  28 U.S.C. § 2254(d)(2); Porter v. Horn, 276 F. Supp 2d 278, 296 (E.D. Pa. 2003); see also Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000); cf. Jackson v. Virginia, 443 U.S. 307, 316 (1979).  "This provision essentially requires the district court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction."  Breighner v. Chesney, 301 F. Supp 2d 354, 364 (M.D. Pa. 2004) (citing 28 U.S.C. § 2254(d)(2) and (f)[7]). Mere disagreement with an inferential leap or credibility judgment of the state court is insufficient to permit relief.  Porter, 276 F. Supp 2d at 296; see also Williams v. Taylor, 529 U.S. 362, 408-09 (2000); Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001).  Only when the

---

[7]"If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination."  28 U.S.C. § 2254(f).

finding lacks evidentiary support in the state court record or is plainly controverted by evidence therein should the federal habeas court overturn a state court's factual determination.  Porter, 276 F. Supp 2d at 296; see also Williams, 529 U.S. at 408-09.

**Discussion**

A.  Exclusion of Expert Testimony

Ventura first argument is that the state trial court erred in excluding the testimony of Dr. Schneider, the psychologist, and Dr. Arden, the pathologist. Ventura contends that their testimony was relevant to his "affirmative (imperfect) defense of self-defense."  Doc. 11, Ventura's Memorandum, p. 11.   Ventura contends that the "death of Michael Donahue . . . was nothing more than an unfortunate accident committed by someone attempting to protect his pregnant girl-friend during a physical altercation." Id. Ventura questions the validity of the state trial court's evidentiary rulings which were made on the merits prior to trial.

Ventura claims that Dr. Schneider's testimony would have revealed that he did not have "'a long-standing indifference to, or repetitive violations of, others' rights.'" Id. at 12 (quoting Dr. Schneider's report). Ventura contends that Dr. Schneider would have testified that Ventura suffered from a substance abuse disorder, an adjustment disorder and personality disorders and that Ventura had "'no history of aggressively acting out towards other persons' [and] that there was no evidence of 'any intent to harm or kill another person.'" Id. at 13 (quoting Dr. Schneider's report).  He claims that Dr. Schneider would have testified that he did not act with the intent to kill or with malice. Id.

As for Dr. Arden, Ventura claims that his testimony also would have

11

established that he did not intend to kill Donahue. Id. at 16.  Dr. Arden provided a "critique" of the nature of the stab wound. Id. at 15.   He noted that the emergency department physician measured the depth of the wound as 1.5 centimeters but that the pathologist who conducted the autopsy indicated the depth was 2.8 centimeters. Id.  However, Dr. Arden did not challenge the finding that the cause of death was a penetrating wound to Donahue's chest. Id. at 16.  Dr. Arden merely provided a critique of the autopsy by stating in his report that "'[t]he wound path within the body is not adequately or accurately described, particularly regarding its trajectory and estimated depth of penetration[.]'"  Ventura argues that the testimony of Dr. Arden would have shown that he was engaging in a jabbing, defensive-type motion when he  inflicted the wound and that he did not intend to kill Donahue. Id.  Ventura in his brief quotes no portion of Dr. Arden's report which suggests that the type of wound inflicted on Donahue indicates that Ventura was acting in self-defense.  Id.

Before we comment on how the state trial court viewed these issues it is important to briefly review portions of the state court trial transcript where Ventura testifies to his actions and state of mind at the time he encountered Donahue at Club Love.  Ventura testified in relevant part as follows:

> Q.  So what happened?
>
> A. . . . Like, to the corner of my eye – see what I didn't know is that Kristen and Bobby – like I didn't know they were in Giovanni Ortiz's face because to me everything was all right. Like, you know, he gave me a cigarette and everything was cool.  Through the corner of my eye I seen Giovanni Ortiz like push Kristen's face.  So when I seen that I kind of lost it a little bit, like –
>
> Q.  Why did you lose it?

A. Excuse me?

Q. You said you kind of lost it, why did you lose it?

A. I mean, any man would lose it if they see his girl hit, you know what I'm saying.  I got a little upset; you know what I'm saying.  So when I seen that I go over here, like you know.  Then Mike Donahue, God bless him, like he – everybody make it seem like he came in – I'm sorry I know his family – he's dead but he didn't come in like to stop the fight. He came in and he shoved me.

So when he shoved me, like, – see through all this transaction when he gave me the cigarette I'm looking for a lighter[8] for a lighter. As I'm looking for the lighter my hand is in my pocket. When he shoved me this all happened so fast, like (snaps fingers), you know, everything happened quick.  So when he shoved me my reaction was, like, (indicating), you know what I'm saying? That's why everybody is saying, like, I was backing away. Like I didn't go at him to stab him – I didn't even mean to stab him, you know. That was never my intentions and, like, I really didn't mean to kill him. That was never – like I'm really sorry. I know you people hate me. I don't know what to say.  Those were never my intentions, you know.

*       *       *       *       *          *               *

Q.  You heard the young gentleman testify yesterday, I think it was Brandon Lawson, who said after you made the kind of jabbing motion you were going backwards.  Is that what you're talking about when you said that you were going backwards trying to get away?

A. Yeah, cause, like, I swung the knife but I'm swinging the knife to get – to just like scare him to get him away from me, you know what I'm saying?  It just happen that I caught him.

---

[8]Ventura's trial testimony reveals that in an earlier encounter with Donahue, Donahue gave Ventura a cigarette. Doc. 18-1, Appendices, Appendix C at 44.

\*       \*       \*       \*       \*       \*              \*

Q. Throughout this time period following your contact with Michael you apparently, according to a number of witnesses, yelled or said continuously, the guy hit my girl, hit my wife, she's pregnant?

A. Yeah.

Q.  Did you know at that time that she wasn't pregnant anymore?

A. Yeah, I knew, but in my mind, my state of frame, you know, she had just gotten the abortion like a week or two ago , you know what I mean? So it was like -

\*       \*       \*       \*       \*       \*              \*

Q.  Just so there's no question about this, was it ever your intent that morning to kill Michael Donahue?

A. Never.

Q. Was it your intent to seriously hurt him?

A. No.

\*       \*       \*       \*       \*       \*              \*

Cross Examination

\*       \*       \*       \*       \*       \*              \*

Q. You told the police, didn't you that you had used that knife to fix a fuel filter on your car?

A. Yes.

Q. That wasn't true; was it?

A. No, it wasn't.

Q. You told the police that you thought you might have cut yourself on it?

A. Yes.

Q. There was blood on the knife and it might have been yours?

A. Yes.

Q. But you told police I didn't stab anybody; didn't you?

A. Yes. I did.

Q. You told the police, I forget – oh, I forgot I had the knife in my jacket, that wasn't true; was it?

A. No, it wasn't.

\*       \*       \*       \*       \*              \*                 \*

Q.  You knew you stabbed somebody; didn't you?

A. But I didn't know where. I didn't even know, like it was serious like that.

Doc. 18-1, Appendices, Appendix C at 43-47.

The trial court stated that Ventura "asserted that Dr. Schneider's testimony was necessary for his self-defense theory by negating the element of specific intent to kill" and that Dr. Arden's testimony also related to the self-defense theory because if the autopsy had

been properly completed "Dr. Arden could have given an opinion on whether the wound was an offensive or defensive wound." Doc. 18-1, Appendices, Appendix K at 173 & 175.   The trial court excluded the testimony of Dr. Schneider and Dr. Arden based on state evidentiary rules and state appellate court cases relating to the admissibility of such evidence. Id.

With respect to Dr. Schneider, the trial court stated that the state appellate court cases cited by Ventura did not support his argument. Id. The trial court noted that two of the cases cited - Commonwealth v. Miller, 634 A.2d 614 (Pa. Super. 1993) and Commonwealth v. Stonehouse, 555 A.2d 772 (Pa. 1989) - dealt with the "battered woman's syndrome" and were not applicable and could not be relied upon for the admission of Dr. Schneider's testimony. Id. at 173.   Two other cases - Commonwealth v. Light, 326 A.2d 288 (Pa. 1974) and Commonwealth v. McCuster, 299 A.2d 286 (Pa. 1972) - required that the psychological testimony establish the state of mind of the accused at the time of the crime and that nothing in Dr. Schneider's report revealed his state of mind during the commission of the crime but merely presented his life history as a child, adolescent and early adult and then skipped to his psychological issues after his incarceration. Id. at 160.[9] Consequently, the trial court concluded that Ventura's reliance on those two cases was misplaced. Id.  The trial court stated that a fifth case relied on by Ventura - Commonwealth v. Walzack, 360 A.2d 919 (Pa. 1976) - which dealt with the defense of diminished capacity as a result of mental disorder and was later interpreted by Commonwealth v. Weinstein, 451 A.2d 1344 (Pa. 1982) was inapplicable because those cases indicated that psychiatric testimony was only

---

[9]The page number generated by the district court's docketing system is incorrect and in fact the preceding page is numbered 173 and the next sequential page is numbered 174.

relevant on the issue of specific intent to kill if the mental disorders impacted the defendant's cognitive function necessary to formulate a specific intent. Id. The trial court further noted that Walzack and Weinstein both held that "irresistable impulse" was not relevant to the question of a defendant's intent and that Commonwealth v. Brown, 578 A.2d 461, 466 (Pa. Super. 1990) held that personality disorders were not relevant to a determination of the diminished capacity defense. Id. at 160 & 174. The trial court concluded that there was no indication that the personality disorders which Dr. Schneider found that Ventura suffered from impacted his cognitive function and they were not relevant to a diminished capacity defense. Id. at 174.

As for Dr. Arden's proposed testimony the state trial court noted that "Dr. Arden did not offer in his expert report any 'conclusion regarding the cause and manner of death or suggesting with medical or scientific certainty that the conclusion drawn by the pathologist was incorrect.'" Id. The trial court further stated that "Dr. Arden merely 'engaged in a critique' of the autopsy and the report completed by [the pathologist]." Id. The trial court concluded that "[s]imple criticism of the techniques employed, and the conclusion reached, without more . . . would serve to only confuse the jury and would not assist them in understanding the evidence or determining a fact in issue." Id. at 175. Consequently, the trial court excluded the testimony of Dr. Arden. Id.

Evidentiary errors of a state trial court "are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." Bisaccia v. Attorney General of State of N.J., 623 F.2d 307, 312 (3d Cir. 1980); see also Walters v. Maass, 45

F.3d 1355, 1357 (9th Cir. 1995)(state court evidentiary rulings are "not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process."); Myrie v. Hundley, Civ.A.No. 93-1681, 1994 WL 21960 at *2 (D.N.J. Jan. 18, 1994) ("... questions relating to admissibility of evidence are matters of state law and generally do not give rise to constitutional errors which are subject to redress in federal habeas corpus proceedings."); Box v. Petsock, 697 F. Supp. 821, 833 (M.D. Pa. 1987) (same)(Nealon,J.).

Based upon a careful review of the record in this case, the court is unable to conclude that the exclusion of the testimony of Dr. Schneider and Dr. Arden was erroneous. Under Pennsylvania rule of Evidence 702, Testimony by Expert Witness:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average lay person; (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.  Also, under Pennsylvania rule of Evidence 402, General Admissibility of Relevant Evidence, "all relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402.  Finally, under Rule 403 relevant evidence can be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Pa.R.E. 403.

The basis for the exclusion of Dr. Arden's testimony appears appropriate in light of the fact that he provided a mere critique of the pathologist's report and did not challenge the cause or manner of death.  As for Dr. Schneider's proposed testimony, the trial court determined that it was irrelevant because it related to personality disorders and did not speak to Ventura's specific intent on the night the incident occurred.  In fact when reviewing the trial court's decision, the Pennsylvania Superior Court stated:

> [A]side from a bald statement that Ventura lacked specific intent when he stabbed Victim, based upon Ventura's previous personal history, there is no assessment or opinion regarding Ventura's state of mind at the time of the crime.  Instead, the report more closely resembles a history of Ventura's life and his emotional state since incarceration and is not relevant for the reason advanced by Ventura.

Commonwealth v. Ventura, 975 A.2d 1128, 1140 (Pa.Super. 2009).  Just as it would have been irrelevant for the Commonwealth to introduce evidence of Ventura's prior history of aggression or homicidal tendencies as tending to prove Ventura committed the acts in question, evidence of lack of tendencies based on life history to negate intent on the night in questions was irrelevant.

Our research revealed additional case law justifying the exclusion of Dr. Schneider's testimony.  In Commonwealth v. Sheppard, 648 A.2d 563 (Pa. Super. 1994) the Pennsylvania Superior Court commented on the issue of admissibility of psychiatric testimony.  That court stated as follows:

> Where the appellant goes astray is in the creation of a third category of mental impairment to diminish or relieve culpability by creating a subjective state of mind to permit an imperfect self-defense. Title 18 Pa.C.S. § 2503(b) does not contemplate diagnosed mental disorders as a shield to a defendant under these circumstances but rather speaks to a misperception of the factual

19

circumstances surrounding the event. *See Light, supra*. The classic case is the situation where a person comes to the door in the middle of the night to ask to use the telephone because of a breakdown, and the occupant, believing a burglar or robber is attempting to gain entrance, shoots in the belief he is acting in self-defense. To extend this concept to the degree proposed by appellant to include a paranoid mental state would open the flood gates to imperfect self-defense claims based entirely on a subjective state of mind when the objective component is not present. While appellant cites *Commonwealth v. Kacsmar,* 421 Pa.Super 64, 617 A.2d 725 (1992), for that proposition, it is not relevant as *Kacsmar* involved a long history of abuse by the victim and psychiatric testimony was relevant to establish the state of mind thereby created in defendant of chronic fear for his life, and the reasonableness of the belief he acted in self-defense when he shot the victim. No case cited by appellant or located during our research establishes that a diagnosis of paranoid personality, without more, is applicable under section 2503(b), so as to permit a claim of imperfect self-defense. The paranoia is either not a factor which would reduce culpability or, if it is a significant factor, it must be pleaded in a "guilty but mentally ill" or insanity defense.

The legislature has perceived a problem relating to psychiatric disorders as it relates to crime, particularly homicide. Aside from the diminished capacity defense, which has to do with voluntary intoxication, at best reducing the degree of homicide (and only homicide) from first degree to third degree, the only other reduction is in the nature of heat of passion pursuant to 18 Pa.C.S. § 2503(a). An imperfect self-defense, pursuant to section 2503(b), does not fit within these categories and is more in the nature of perception based upon faulty analysis of the circumstances, or state of mind arising from a pattern or history of interaction, which would lead to a reaction based on fear of one's safety arising out of previous abuse. This is what *Kacsmar* speaks to, as do those jurisdictions which have adopted the "battered wife syndrome" as a justification for homicide.

Id. at 569 (footnotes omitted).   In sum psychiatric testimony is not relevant under state law to establish an "imperfect self-defense." Id.   Instead, a defendant can establish the defense by taking the stand and testifying to his state of mind. Id.   Ventura testified at trial regarding his state of mind in support of an "imperfect self-defense."   The record fails to establish that as a result of the exclusion of Dr. Schneider's testimony that Ventura was deprived of a fair

trial.[10]

Ventura has failed to show that the state trial court and Pennsylvania appellate courts' decisions on the merits with regard to the evidentiary rulings resulted in a decision that was contrary to, or involved and unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States or that the trial court's rulings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, this court finds that Ventura's claim that he was denied a fair trial by the exclusion of expert testimony is without merit.

B. Ventura's Statements to Law Enforcement Officers

Ventura's second claim is that the trial court erred in denying his motion to suppress the statement which he made to police after he was arrested but before he was advised of his Miranda rights as well as the statements he made after he was advised of those rights. Ventura contends that he was subjected to custodial interrogation and that he was too inebriated to voluntarily waive his Miranda rights.

The law is absolutely clear that statements made by an individual spontaneously or without prompting after being placed in police custody are not subject to exclusion at the time trial. Rhode Island v. Innis, 446 U.S. 291, 300 (1980); Alston v. Redman, 34 F.3d 1237, 1246-47 (3d Cir. 1994). The law requires both custody and

---

[10]In his report Dr. Schneider stated that he found "no evidence that there was any intent to harm or kill any other person." Evidence was submitted at trial that Ventura inflicted deadly force to a vital part of Donahue's body. Such force is circumstantial evidence that Ventura intended to kill Donahue. Dr. Schneider was not present at the time of the incident and had no ability to rebut this circumstantial evidence.

interrogation. Id. Interrogation is defined as express questioning regarding the alleged crime or "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." U.S. v. Browlee, 454 F.3d 131, 146 (3d Cir. 2006)(quoting Innis, 446 U.S. at 300-01).

Furthermore, although a waiver of an individual's Miranda rights must be given voluntarily, knowingly, and intelligently, it has  been held that

> [t]he fact that an accused has been drinking does not automatically invalidate his subsequent incriminating statements. The test is whether he had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it.  Recent imbibing or the existence of a hangover does not make his confession inadmissible, but goes only to the weight to be accorded it.

Commonwealth v. Smith, 447 Pa. 457, 460 291 A.2d 103, 104 (1972). "While courts have recognized the influence of drugs as one factor in determining voluntariness, involuntariness may not be inferred merely because of drug usage or ingestion. Rather, such usage must have had the effect of overcoming [the defendant's] free will." Ledesma v. Gov't of V.I., 159 F.Supp.2d 863, 867 (D.Vi.2001) (citing Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). For example, in U.S. v. Andrews, 231 Fed. App'x 174, 177 (3d Cir.2007), the Court of Appeals for this circuit, affirming the district court's denial of the defendant's motion to suppress, held that there was no "evidence that [the defendant's] will was overborne because he had been smoking marijuana or ingesting Xanax more than thirteen hours prior to his confession." The court reached this conclusion in part based on a detective's testimony that, during the police interview, the defendant "did not exhibit any of the symptoms of someone who was under the influence of marijuana and Xanax. Rather,

[the detective] found [the defendant] to be alert and lucid." Id . The detective further testified that the defendant "spoke clearly, answered the questions directly, and provided specific details regarding his participation in the armed robberies." Id. ; see also U.S. v. Adamson, 2008 WL 167299, at * 7 (E.D.Pa. Jan.16, 2008) (concluding that despite defendant's ingestion of morphine and Percocet, defendant voluntarily waived his Miranda rights because, during his interrogation, the defendant was able to provide coherent explanations to the detective's questions, "never appeared sleepy or confused, was able to understand and answer questions asked of him, did not mumble or slur his speech, and never complained that he felt unwell.").

In the present case the state trial court found based on testimony from the arresting officers that Ventura made statements spontaneously and not as the result of interrogation.  The trial court in its opinion stated as follows:

> Officer Foster testified that, while detaining [Ventura] outside Club Love, [Ventura] blurted out statements claiming that a man struck his pregnant girlfriend. The Officer stated that at no time did he ask [Ventura] any questions during this period of detention. Officer Rhodes then arrived on the scene to assist Officer Foster. At which point, Officer Rhodes asked [Ventura] his name and instructed him to cooperate with police procedures. Officer Rhodes testified that [Ventura] continued to make unsolicited statements throughout the ride to the station and in the elevator of the station house. The Officer advised [Ventura] that he would be able to make a statement later.  Again, the Officer testified that at no time did he ask [Ventura] any questions in furtherance of the investigation.

> Although, [Ventura] was undeniably in the custody of the State College Police Department, this Court finds that the testimony of Officers Foster and Rhodes is credible regarding the manner in which the arrest occurred.  Therefore, [Ventura] has not provided sufficient evidence to prove that Officers were in fact interrogating him because the Officers did not conduct themselves in a manner that was likely to solicit an admission by [Ventura].  As a result, the statements made by [Ventura] need not be suppressed.

Doc. 18-1, Appendices, Appendix K at 168-169.   As for Ventura's claim that he did not

voluntarily waive his <u>Miranda</u> rights, the trial court stated as follows:

> Detective Ralston testified that [Ventura] did not appear drunk at the time of questioning because he did not slur his words and was oriented to time and place.  In addition, the Detective stated that throughout the interrogation [Ventura] selectively chose his answers claiming he did not want to "incriminate" himself.

> Since the Commonwealth need only prove voluntariness by the preponderance of the evidence, the burden is met because [Ventura] demonstrated the sufficient mental capacity necessary to voluntarily waive his rights.  He was cognizant of the reasons for his arrest and he selectively chose to answer only non-incriminating questions, whereas a highly intoxicated person would not have the same decision-making capability.  Therefore, the statements made during the interrogation came after a voluntary waiver by [Ventura], and, consequently, the statements will not be suppressed.

<u>Id.</u> at 169-170.  The Superior Court affirmed the decision of the trial court noting that the record before the trial court supported its finding that the statements by Ventura prior to being advised of his <u>Miranda</u> rights were spontaneous and made by him without any prompting. <u>Id.</u>, Appendix L at 190-191.  The Superior Court further found based on the facts of record that the trial court did not err in determining that Ventura knowingly waived his <u>Miranda</u> rights. <u>Id.</u> at 194.

When an issue has been adjudicated on the merits in state court, habeas corpus relief can be granted only if the adjudication of the claims by the state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or in a decision that was based on an unreasonable determination of the fact in light of the evidence. 28 U.S.C. § 2254(d).

The state trial court on August 25, 2006, held a hearing on Ventura's suppression motion. <u>Id.</u>, Appendix F at 106-107 & Appendix H at 124.  After hearing evidence, the trial court concluded that Ventura made unprompted statements and

voluntarily waived his Miranda rights.   The decision was based on the trial judge's credibility finding in favor of the police officers.  The trial court's decision was neither an unreasonable determination of the facts, nor an unreasonable application of the law. Accordingly, this court finds that Ventura's claim that the trial court erred in failing to suppress his statements is without merit.

### C.  Jury Instructions

Ventura's third and fourth claims are interrelated.   Ventura contends that trial counsel was ineffective for failing to object during the trial court's initial instruction to the jury as well as for failing to object to the trial court's answers to jury question number one. Ventura claims that the trial court's initial charge on voluntary manslaughter did not include an instruction on imperfect self-defense and trial counsel was ineffective for failing to object to that omission.   Ventura also claims that trial counsel was ineffective when he failed to request that the court reinstruct the jury on the elements of voluntary manslaughter in addition to first and third degree murder  in response to the jury's first question which asked the difference between malice and intent.

In Strickland v. Washington, 466 U.S. 668, 688,(1984), the United States Supreme Court held that to prove a constitutional violation for ineffective assistance of counsel, a habeas petitioner must meet a two-pronged test. The petitioner must show "that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." Id. at 687; accord Deputy v. Taylor, 19 F.3d 1485, 1493 (3d Cir.1994).

To demonstrate deficient performance, a petitioner must show that "counsel's performance fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688; accord Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir.2001). A reviewing court must

"indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; accord Jermyn, 266 F.3d at 282; Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir.1996). If, under the circumstances, counsel's actions might be considered sound trial strategy, the presumption is not rebutted, Strickland, 466 U.S. at 689, because "substantial deference is to be accorded counsel's tactical decisions." United States v. Wiener, 127 F.Supp.2d 645, 648 (M.D.Pa.2001). A decision supported by "reasonable professional judgment does not constitute ineffective assistance of counsel. See Burger v. Kemp, 483 U.S. 776, 794, (1987). It follows that counsel cannot be deemed ineffective for pursuing a meritless claim. Hartey v. Vaughn, 186 F.3d 367, 372 (3d Cir.1999).

A petitioner satisfies the second prong and shows prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Frey v. Fulcomer, 974 F.2d 348, 358 (3d Cir.1992) "Without proof of both deficient performance and prejudice to the defense ... it could not be said that the sentence or conviction resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable, and the sentence or conviction should stand." Bell, 535 U.S. at 695 (internal quotations and citation omitted). In assessing whether the result of the proceeding might have been different, a reviewing court must consider the "totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695; Jermyn, 266 F.3d at 283. However, "a court can choose to address the prejudice prong before the ineffectiveness prong and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." Rolan v. Vaughn, 445

F.3d 671, 678 (3d. Cir. 2006). "The object of an ineffective assistance claim is not to grade counsel's performance. If it is easier to dispose of an ineffective assistance claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

At the time the state court reviewed the claims raised by Ventura, Strickland's familiar two-pronged test was the "clearly established federal law" applicable to ineffective assistance of counsel claims. Under Pennsylvania state jurisprudence, a three-prong test is applied to ineffective assistance of counsel claims, but is, in substance, identical to the Strickland test. See, e.g., Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973, 975-77 (Pa.1987). The Third Circuit Court of Appeals has held that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to Strickland. Jacobs v. Horn, 395 F.3d 92, 107 n. 9 (3d Cir.2005); Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir.2000). Thus, under § 2254(d)(1), the relevant inquiry in addressing an ineffectiveness claim that has been adjudicated on the merits is whether the Pennsylvania's Supreme Court's decision involved an unreasonable application of Strickland. Jacobs, 395 F.3d at 107 n. 9; Werts, 228 F.3d at 204.

Ventura contends that the evidence at the time of trial warranted an imperfect self-defense jury instruction. Murder can be reduced to voluntary manslaughter "if at the time of the killing [the defendant] believe[d] the circumstances to be such that, if they existed, would justify the killing under [general justification principles], but his belief [was] unreasonable." 18 Pa.C.S.A § 2503(b). The Suggested Standard Pennsylvania Criminal Jury Instruction relating to this section of the Crimes Code states in part as follows:

The reducing circumstances of a defendant acting under an

27

> unreasonable belief that the circumstances of the killing were justified applies where:
>
>  a. the defendant actually believed that he was in immediate danger of death or serious bodily injury from [the victim] at the time he used deadly force, but his belief was unreasonable in light of the facts as they appeared to him at the time . . . .

Pa. SSJI (Crim), § 15.2503A (2006).   When the trial judge initially came to this portion of the jury charge, he stopped and the following discussion was held on the record:

> The Court: The reducing circumstances of a defendant acting under an unreasonable belief that the circumstances – is this relevant in this case?
>
> [Defense counsel]: I don't believe it does, Judge.
>
> [District Attorney]: That's correct.
>
> The Court: I don't believe I need to go into that.

Doc. 18-1, Appendices, Appendix C at 82.   The trial court skipped over this portion but otherwise fully instructed on the elements of first and third degree murder, voluntary manslaughter and involuntary manslaughter.   Id. at 79-85.

     After the jury was deliberating for a period of time, the jury sent a question to the judge which stated in part "How does malice differ from intent?" Id. at 87.   In response to this question, the court reinstructed on the elements of first and third degree murder but did not reinstruct the jury on the elements of voluntary manslaughter.   Id. at 88-90.   Defense counsel did not object to the court's decision to only reinstruct the jury on first and third degree murder.   Id.   At a post-conviction hearing, defense counsel explained that he did not object because it was his judgment that the jury at that point was attempting to decide between first and third degree murder.   Doc. 18–1, Appendices, Appendix O at 247. Defense counsel  explained that first degree murder required specific intent and that third

28

degree murder did not and that if the court reinstructed on voluntary manslaughter which also required an intent to kill, that "if they accepted that the killing was intentional for voluntary manslaughter purposes, it could just as easily turn around and say that establishes first degree murder and establishes the malice because of the deadly weapon. So that was a problem that I dealt with and struggled with not only pretrial but even throughout the trial." Id. at 255.   He further explained it was his decision not to seek reinstruction on voluntary manslaughter following the jury's first question because "it was obvious [the jury was] working [its] way down the list of charges. They were at first and third degree murder. That at that point I was still very concerned about this intentional killing and somehow the jury tying that into first degree murder and returning a verdict of guilty of first degree murder based upon an intentional killing." Id. at 250.  Defense  counsel also explained that he did not request and "imperfect self-defense" instruction at that point for the same reason. Id. at 248-249.

After being reinstructed by the trial  court on the elements of first and third degree murder they recommenced deliberation and subsequently sent a second note to the trial judge which stated as follows: "Can we please review the specific differences between third-degree murder and voluntary manslaughter? How can these both apply at the same time?" Id., Appendix C at 90-91.  In response to those questions the trial court reinstructed the jury several times on the elements of third degree murder and voluntary manslaughter. Id. at 91-95.  In addition the trial court fully instructed the jury several times on the elements of "imperfect self-defense." Id.  At that point defense counsel was of the opinion that the jury had moved past first degree murder and it was then advantageous to have the court instruct the jury on imperfect self-defense.  Id., Appendix O at 248-249.

The post-conviction trial court found based on the testimony of Ventura's defense counsel that defense counsel was not ineffective for failing to object to the court's jury instructions and the manner in which the court answered the jury's questions. Id., Appendix P.  The court found that defense counsel articulated a reasonable basis for his trial decisions relating to the jury charge and the jury's questions and that defense counsel's decisions were "the result of a reasonable legal strategy designed to minimize the risk of a first degree murder conviction." Id.  The court further found that there was no evidence of prejudice because the jury was reinstructed on voluntary manslaughter after the second jury question. Id.  The Pennsylvania Superior Court affirmed the decision of the trial court. Id., Appendix U.  The Superior Court stated in pertinent part that "[a] jury charge is erroneous only if the charge as whole is inadequate, unclear, or has a tendency to mislead or confuse rather than clarify, a material issue" and found that the trial court fully instructed the jury on first and third degree murder, voluntary manslaughter, imperfect self-defense and involuntary manslaughter several times. Id.  The Superior Court also concluded that defense counsel had a rational basis for his decisions to not object to the jury charge or the trial court's responses to the questions from the jury.

The trial court's decision was neither an unreasonable determination of the facts, nor an unreasonable application of the law. Accordingly, this court finds that Ventura's claims of ineffective assistance of counsel are without merit.

An appropriate order will be entered.

 s/A.Richard Caputo

A. RICHARD CAPUTO

United States District Judge

Dated: December 29, 2014

30